UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MALCOLM HEAGS,

        Plaintiff,

    v.

DENIS R. MCDONOUGH, Secretary of
the U.S. Department of Veterans
Affairs,

        Defendant.

No. 21 CV 6212

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Malcolm Heags served as the Chief of Environmental Management Services at the Hines Veterans Affairs Hospital; he was responsible for the cleaning and maintenance of the entire Hines campus. When it was discovered that a company owned by a sex offender had been hired to do emergency COVID-19 cleaning services, the VA opened an investigation. The investigation concluded that Heags had failed to appropriately supervise his staff, including in the oversight and administration of contracts with outside companies. The Hines VA director gave Heags notice that he would be fired for failure to effectively perform his supervisory duties, conflict of interest, and lack of candor. Heags retired before he was formally fired. He now brings this suit alleging that the termination of his employment is the result of race and age discrimination. Because Heags cannot show that the reasons given for his

termination were not his employer's legitimate, non-discriminatory beliefs, judgment is entered for the VA.

## I. Legal Standards

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "'Material' facts are facts that 'might affect the outcome of the suit,' and a dispute as to those facts is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Hunter v. Museke*, 73 F.4th 561, 565 (7th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment is also appropriate when "a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"On summary judgment the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Adickes v S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970). The court does not, however, make credibility determinations, weigh the evidence, or decide which inferences to make from the facts; those are jury functions. *Anderson*, 477 U.S. at 255.

## II. Facts

Malcolm Heags, an African-American man, was employed by the Hines Veterans Affairs Hospital in Chicago, Illinois for thirty-eight years. [36] ¶¶ 1–2.[1] At

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are largely taken from the parties' responses to Local Rule 56.1 statements of facts where both the asserted

the time his employment ended, Heags was the Chief of Environmental Management Services, responsible for the cleaning and maintenance of the entire Hines VA campus. [36] ¶¶ 2, 6. As the chief of EMS, Heags was responsible for the hiring and firing of employees and external contractors; Heags supervised 252 employees. [36] ¶¶ 7–8, 28.

In 2019, Heags came to know a company called America's Best at Work, and the company's owner, Ezekial Lopez. [36] ¶¶ 9–10. Heags recommended America's Best for COVID-19 emergency housekeeping services, and in April 2020, Lopez and America's Best at Work signed a contract to do emergency cleaning at the Hines VA. [36] ¶¶ 15, 30. The VA point of contact for the America's Best contract was Rommeal Lear, who was Assistant Chief of EMS; he was assisted by Supervisory Administrative Officer Frank Pease. [36] ¶¶ 13, 16. Heags was the direct supervisor of Lear and Pease. [36] ¶ 16.

Contractors from America's Best worked at the Hines VA from April 2020 to approximately August 2020. [36] ¶ 17. In early July 2020, Heags, working with

---

fact and response are set forth in one document. [36], [38]. Referenced page numbers are taken from the CM/ECF header placed on the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. Plaintiff attached all of his exhibits as one file, [35-1], so I refer to both CM/ECF header and the page and line number of a deposition transcript, for example: [35-1] at 7 (6:5–8). I disregard irrelevant and redundant statements. *See* [36] ¶¶ 11, 19, 21, 40, 47–52, 56–66, 71 *and* [38] ¶¶ 15, 34–35. I accept some of the statements with slight corrections. *See* [36] ¶¶ 15–18, 20, 23, 31, 32, 34, 36, 46 *and* [38] ¶¶ 3, 14, 26, 36. The following statements were not refuted by the party's response and are deemed admitted: [36] ¶¶ 12, 14, 25, 29, 30, 33, 35, 41, 42, 44, 68–70, 72 *and* [38] ¶¶ 1, 2, 5, 11, 13, 18, 24, 25, 27, 31–33, 39. Finally, N.D. Ill. L. R. 56.1(e)(2) prohibits additional facts in a response to a statement of fact that are not fairly responsive to the asserted fact, so I ignore additional facts. *See* [36] ¶¶ 19, 32, 44, 45, 69 *and* [38] ¶¶ 1, 8, 9, 13, 18–25, 32, 36, 37.

others, proposed to extend America's Best's contract through March 2021. [36] ¶ 18.
At some point in July 2020, news broke that Lopez was a convicted sex offender; Lopez
was removed from the Hines campus and the contract with America's Best was
terminated. [36] ¶¶ 22–23. A VA official said, "There were probably 100 phone calls
that first few days when this stuff blew up. It was nuts. You had everybody from [the]
undersecretary down making phone calls and conference calls." [38] ¶ 39.

The director of the Hines VA, James Doelling, convened an Administrative
Investigation Board to investigate several issues related to the America's Best
contract. [36] ¶ 24. VA officials who did not work at the Hines campus comprised the
AIB. [36] ¶ 25. The Board was appointed to investigate "allegations of fraud, waste
and abuse related to inappropriate pre-existing relations with a vendor or receiving
any type of benefit related to award of a contract or aiding the vendor in
circumventing background check requirements; lack of oversight related to ensuring
background checks or pre-employment conditions were completed;" and how the
contract came to be awarded to a vendor who was a registered sex offender. [36] ¶ 24.

The AIB interviewed 19 VA employees under oath, including Heags, Lear,
Pease, and Heags's wife. [36] ¶¶ 26–27. The AIB concluded its investigation in
October 2020 and issued a report with its findings. [36] ¶ 36; [33-4].

### A.    Contracting Officer's Representative Certification

It was the beginning of the COVID-19 pandemic when the VA entered into the
America's Best contract, and the federal government had authorized "Emergency-
related acquisition flexibilities" in the rules regarding government contracts. [38] ¶ 1.

Scott Ivy, the head of contracts at the regional acquisition center for the VA testified to the AIB, "There's really no template in the VA for something like this. Everybody was kind of making it up as they went. This was probably one of the first contracts that got awarded." *Id*. He acknowledged, "we needed more teaching, I think, and some training for this." [38] ¶ 5.

Ivy testified to the AIB that under the emergency acquisition rules a Contracting Officer's Representative was not recommended or mandated for contracts under $700,000. [38] ¶ 31. The America's Best contract was initially $71,500 and was increased to $352,800 in May 2020. [38] ¶ 33; [33-1] at 148. The AIB found that Heags had failed to ensure that his employees had adequate contracting credentials when assigning them as Contracting Officer's Representatives, specifically it found that Assistant EMS Chief Lear's Contracting Officer's Representative certification had expired on July 3, 2018. [36] ¶ 41; [33-4] at 12–13.

## B.    Failure to do Background Check and Fingerprinting

All outside contractors had to be vetted and receive a Personal Identity Verification badge to work on the Hines VA campus. *See generally* [36] ¶¶ 4–5, 20, 32–33; [38] ¶¶ 18, 20–22. In March 2020, Supervisory Administrative Officer Pease emailed Jodi Yenerall, the head of HR, and cc'd Lear and Heags. [38] ¶ 24.[2] Pease's email informed Yenerall about the America's Best contract and asked, "What will be

---

[2] Defendant denies this assertion based on the fact that the quoted emails are on the page following the cite, VA 5435 not VA 5436. [38] ¶ 24. The objection is overruled because evidence on the very next page in the record supports the assertion; I ignore additional facts in the response.

the protocol for [Personal Identity Verification] badging?" *Id*. Yenerall replied to all and wrote, "They all need to be sponsored … We have to coordinate max 6 at a time in PIV, please work directly with [the Personal Identity Verification officer] to determine timeslots." [35-1] at 232; [38] ¶ 22.

Yenerall testified to the AIB, "From there, [Pease] was supposed to get with PIV staff and go ahead … I assumed it just happened, I don't really micromanage PIV staff." [38] ¶ 23. Yenerall did not know that the America's Best staff had not been badged until July because she was "under the impression that it had already been done." [38] ¶ 23.[3]

Lear, Pease, and Heags all testified to the AIB that the contracting officer at the VA regional acquisition center had told them that background checks and fingerprinting were not necessary for the America's Best employees because it was a temporary contract. [38] ¶ 25. The contracting officer testified to the AIB that he did not tell Lear, Pease, or Heags that no background checks or fingerprinting were needed for the America's Best contract. *See* [38] ¶ 27; [35-1] at 179–80 (25:2–26:10). But the contracting officer did tell the investigators that from the information he received about the America's Best contract, background checks were not required because of "the time frame of it and what was required in the Statement of Work." [35-1] at 180 (26:11–17); [38] ¶ 27. The AIB investigators had some evidence that the

---

[3] Defendant's objection to paragraph 28 of Heags's Local Rule 56.1 statement of facts is sustained. *See* [38] ¶ 28. The cited portion of the record does not contain any discussion of Pease sending ABAW employees to be fingerprinted. *See* [33-6] at 33:1–34:24.

background checks ordinarily conducted by the VA do not check for sex crimes. *See* [38] ¶ 26; [35-1] at 35–36 (34:22–35:4).

The Personal Identity Verification officer in HR testified to the AIB that it was his office's responsibility to get contractors badged. [38] ¶ 18.[4] Yenerall testified to the AIB that when a VA division hires an outside contract, "we just work closely with the contracting rep. What they'll do is email me and let me know there is a new contract coming on campus … I'll just defer that to my PIV office, and then they go ahead and set that up with the point of contact and we get them fingerprinted quickly." [33-10] at 12:5–15; [38] ¶ 20. She also testified that the Contracting Officer's Representative would provide the list to the Personal Identity Verification office "and work through myself, because they're currently under me, to ensure we can get them in timely, especially with COVID[.]" [38] ¶ 21.

Yenerall told the AIB that Heags, Lear, and Pease would have been aware that America's Best employees had to be fingerprinted and receive security clearances before working at Hines. [36] ¶ 35. She testified that she became very concerned when Heags told her that several America's Best employees had trouble getting fingerprinted in July 2020 because they had been working at Hines without being fingerprinted or cleared. *Id.*

---

[4] I disregard Heags's conclusory allegation that the PIV officer and Yenerall were responsible for the failure of America's Best workers getting fingerprinted. *See* [38] ¶ 17. The material cited to support the assertion is already discussed in [38] ¶ 18 or otherwise irrelevant to the assertion. *See* [33-6] at 12 (11:14–24) (discussing purchase orders for contractors, not PIV procedures).

Heags testified to the AIB that he was unaware of the exact types of background checks required for contractors, but he knew that a background check needed to be done for a contractor to work at the VA. [36] ¶ 28. Heags received emails in July 2020 from America's Best employees stating that they had been turned away when they went to get fingerprinted and submit their information for a background check in April 2020. [35-1] at 121–24; [38] ¶ 29.[5]

Assistant Chief Lear testified to the AIB that he never sent any contractors to HR to be security screened, even before the emergency rules. [38] ¶ 19; [36] ¶ 32. Pease, who was Heags's assistant and worked on the America's Best contract, testified to the AIB that he was aware that all VA contractors had to be badged, he was unaware of whether it had been done for the America's Best contractors, and he thought it was the Contracting Officer's Representative's responsibility to ensure the contractors were cleared to work. [36] ¶ 33. To Pease's understanding, Lear was the Contracting Officer's Representative for the America's Best contract. *Id*.

The AIB concluded that America's Best employees had been allowed to work at Hines without the required fingerprinting and background checks, and that Heags and his staff failed to conduct the appropriate oversight of the contract to ensure the contractor complied with applicable VA regulations. [36] ¶¶ 37, 39; [33-4] at 10–11.[6]

---

[5] Defendant's objection to paragraph 29 of Heags's Local Rule 56.1 statement of facts on the basis of hearsay is sustained to the extent Heags seeks to use the emails as proof that the America's Best employees were actually turned away from the HR office. *See* [38] ¶ 29. The emails and Heags's testimony are competent evidence that Heags heard from the contractors that they had been turned away from HR.

[6] Plaintiff objects to ¶¶ 39–41 of defendant's Local Rule 56.1 statement of facts, the AIB's conclusions, by disputing the facts underlying those conclusions. *See* [36] ¶¶ 39–41. The cited materials support Plaintiff's factual disagreements with the substance of the conclusions, but

The AIB found that this failure of oversight led to the omission of pertinent information related to Lopez's criminal history, which was relevant because Hines had a childcare center on the campus. [36] ¶ 39; [33-4] at 11. The AIB also concluded that Heags failed to adequately supervise his staff's management of the America's Best contract because he never followed up with anyone after HR instructed him that America's Best contractors needed to complete the Personal Identity Verification process. [36] ¶ 41; [33-4] at 13.

### C.    Family Working for America's Best at Work

After America's Best at Work got the contract to provide cleaning services at Hines, Heags's stepdaughter worked at America's Best for about a week. [36] ¶ 31.

During the AIB investigation, Heags initially testified that none of his relatives or anyone he knew personally worked at America's Best. [36] ¶ 29. During a second interview with the AIB, Heags testified, "I think I recall you might have asked did I have anybody that was a relative that worked there prior to the contract being awarded, which my answer would be no. But one of the things that I did, that I was able to sit down and I was able to think about was my wife's daughter did work there, and she worked there for about a week and a half." [33-6] at 6:15–22; [38] ¶ 13; [36] ¶ 31.

Heags said during his second interview with the AIB that he did not think it was a conflict of interest because he did not have a relationship with his wife's adult

_____

that does not controvert the fact that the AIB made the stated conclusions. Plaintiff's objections are overruled.

9

daughter and when he was informed about it, he asked his wife to relay to her daughter that she should stop working at America's Best. [38] ¶ 11. Heags's wife testified to the AIB that her daughter had worked for America's Best after the company was awarded the contract at Hines. [36] ¶ 34. Other Hines employees' children and family members worked for America's Best. [36] ¶ 34; [38] ¶ 8.[7]

Ivy, the head of contracts at the regional acquisition center, testified to the AIB that from his point of view, this "got blown out of proportion." [38] ¶ 2. Ivy had been told by Lopez that Heags's stepdaughter never received a paycheck. [38] ¶ 12.[8]

The AIB found that a number of Hines's employees had children or family members who worked for America's Best and that Heags's stepdaughter had started working for America's Best after the Hines contract was awarded. [36] ¶¶ 36, 38; [33-4] at 10.

### D.    AIB Recommendations and Termination Process

The AIB recommended increased training for EMS and HR staff and that Heags develop a standard operating procedure for contracting with outside vendors.

---

[7] Defendant's objection to paragraph 10 of Heags's Local Rule 56.1 statement of facts is sustained because there is no competent evidence to support the assertion that a March 2020 OPM memo allowed the hiring of family members. *See* [38] ¶ 10. Heags's letter in response to the notice of removal is an unsworn and unverified statement and there is no copy of the OPM memo attached. *See* [33-12] at 4. The other document cited appears to be an OPM memo from March 2020, *see* [35-1] at 55–57, but it does not discuss hiring family members; it is about fingerprinting requirements during the emergency period.

[8] Defendant objects to the assertion that Lopez told Ivy that the stepdaughter had not received a paycheck as hearsay. [38] ¶ 12. I do not consider the statement as proof that Heags's stepdaughter did not receive a paycheck; that would be hearsay. But the statement is admissible evidence as context for why Ivy thought the conflict of interest issue was blown out of proportion.

[38] ¶ 3; [33-4] at 13–14. The AIB did not recommend termination for anyone. [38] ¶ 3; [33-4] at 13–15.

In early January 2021, Heags's boss, Jon Beidelscheis, proposed Heags's removal and listed three charges as the basis for termination: (A) failure to effectively perform supervisory duties; (B) conflict of interest; and (C) lack of candor. [36] ¶ 42. Beidelscheis recommended termination because of the seriousness of Heags's misconduct and the fact that he had similar incidents of supervisory misconduct. *Id.* Beidelscheis testified that Yenerall drafted the notice of proposed removal after he made the decision to recommend termination and that she had helped to gather evidence, but he didn't remember whether she had made a recommendation. [38] ¶ 6. Yenerall said that she was not involved in recommending Heags be terminated and she didn't review a proposed removal; she did not remember who had been assigned to handle the matter. [38] ¶ 7. Heags was given seven days to respond to the notice. [38] ¶ 16.[9] Pease was also disciplined with a letter in his file; Lear retired in October 2020. [38] ¶ 36; [36] ¶ 32.[10]

---

[9] The VA objects to Heags's assertion that he "was given a binder with over 3400 pages and told he had seven days to rebut the recommendation of his removal" as unsupported by competent evidence because it cites to Heags's unsworn and non-verified written statement submitted in response to the notice of removal. [38] ¶ 16. I agree, the letter (when offered by Heags) is not competent evidence of the truth of what is asserted therein—that Heags was given a binder with 3400 pages and seven days to respond. The other evidence cited to support the assertion is the Notice of Removal itself and that indicates that Heags had seven business days to respond, *see* [33-11] at 4 (¶ 3), but says nothing about the amount of evidence enclosed. The VA's objection is sustained in part and overruled in part.

[10] The VA's objection to ¶ 4 of Heags's Local Rule 56.1 statement of facts is sustained because the cited evidence does not support the assertion. *See* [38] ¶ 4. Beidelscheis's deposition testimony only supports the assertion that he did not know whether anyone other than Heags or Pease was disciplined, not that no one else was disciplined. *See* [35-1] at 136–37 (36:20–37:6).

11

Heags submitted a written response to the notice and charges on January 13, 2021. [36] ¶ 42. A supervisory human resources specialist from a separate VA medical center who had never worked with Heags reviewed the AIB file and consulted with VA management and general counsel. [36] ¶¶ 53, 55. He assembled the evidence file, prepared the proposed removal, reviewed Heags's written response, and drafted Doelling's removal decision. [36] ¶ 55. Doelling, the director of the Hines VA medical center, issued his decision on January 22, 2021, to uphold Heags's proposed removal, to be effective on January 30, 2021. [36] ¶ 43. Doelling's decision was in writing and he stated that he considered the seriousness of the offenses, Heags's length of service, and whether there were any mitigating or extenuating circumstances. [36] ¶ 44. Doelling noted that because Heags was the chief of Environmental Management Services, he was held to a higher standard of conduct. *Id*.

In his final decision, Doelling found that there was substantial evidence that Heags did not provide sufficient oversight of his subordinates or the contracts he and his staff were responsible for administering, which resulted in America's Best employees working at Hines for several months without obtaining Personal Identity Verification badges. [36] ¶ 44.[11] Doelling found that Heags was an experienced manager familiar with the requirement for background checks, and especially after Yenerall sent an email stating that Personal Identity Verification badges were

---

[11] Plaintiff objects to ¶¶ 44–45 of defendant's Local Rule 56.1 statement of facts, Doelling's conclusions in the decision on removal. [36] ¶¶ 44–45. Plaintiff's objections rely on disputes of fact underlying the conclusions, for example who had ultimate responsibility to ensure contractors were fingerprinted. *See* [36] ¶ 44. But none of the cited materials refute that Doelling made those conclusions, so Plaintiff's objections are overruled.

needed, Heags could not have reasonably continued to doubt that the America's Best employees needed to be badged. *Id*. Doelling stated that it was ultimately Heags's responsibility to ensure that the America's Best employees were badged and that even assuming America's Best employees were turned away when they went to get their Personal Identity Verification badges, Heags took no reasonable steps to address the issue. *Id*. Doelling also found that Heags did not appropriately oversee Lear because he allowed Lear to administer contracts after Lear's Contracting Officer's Representative certification ended. *Id*.

Doelling concluded that Heags should have obtained ethics guidance before his stepdaughter started working for America's Best under its contract at Hines. [36] ¶ 45. Doelling found that Heags's testimony before the AIB on August 17, 2020, that he did not know anyone personally who worked at America's Best, was not true. *Id*. Doelling concluded by finding that the charges were supported by evidence, were serious, and resulted in a loss of trust and confidence in Heags's ability to perform his duties. *Id*. He therefore found that removal was an appropriate discipline. *Id*.

Heags retired from the VA effective January 29, 2021. [36] ¶ 46. Heags had not intended to retire from the VA until September 2025, when he would be 62. [38] ¶ 37. The VA disputes this and asserts that Heags's decision to retire was voluntary. *See* [36] ¶¶ 2, 46, 54. Heags receives a pension from the VA. [36] ¶ 3.

### E. Additional Evidence

Both parties offer evidence that was not presented to the AIB about the three charges for which Heags was fired.

1.    *Contracting Officer's Representative Certification*

During 2019 and 2020, several Contracting Officer's Representatives worked in the EMS department. [36] ¶ 12. Being a Contracting Officer's Representative or Point of Contact was an ancillary task for EMS employees, so Heags recommended Lear to be appointed to that position by the VA contracting office. [36] ¶ 14. The parties dispute whether Lear was the Point of Contact or the Contracting Officer's Representative for the America's Best contract, but he was the functional point-person on the contract. *See* [36] ¶¶ 14, 21, 32 *and* [38] ¶¶ 31, 32, 38.[12]

If a contract was for less than $300,000 and of a short duration, then the point of contact for the contract did not need to be a Contracting Officer's Representative or take the associated training. [38] ¶ 32. At his deposition Heags testified that it was not improper to assign Lear as the Contracting Officer's Representative on the America's Best contract, even though his certification had lapsed, because the dollar amount of the contract fell below $300,000. [36] ¶ 72. The parties dispute whether Heags assigned Lear to a contract that required a Contracting Officer's Representative while Lear's training was out of date, [38] ¶ 38, and who was ultimately responsible for ensuring that a Contracting Officer's Representative has proper certification. *See* [38] ¶¶ 30, 40.

---

[12] Plaintiff objects to ¶¶ 32, 44, 45, 68, 70 of the VA's Local Rule 56.1 statement of facts because the paragraphs contain multiple facts take up an entire page, in derogation of N.D. Ill. L.R. 56.1(d)'s requirement of short and concise statements of facts. *See* [36] ¶¶ 32, 44, 45, 68, 70. I agree that the paragraphs are too long and contain too many facts, but I have discretion whether to accept the statements despite the violation. In this case I do accept the facts contained within the statements that are supported by competent evidence.

14

### 2. Badging for America's Best Workers

Yenerall testified at her deposition that it was HR's responsibility to ensure the contracted employees were fingerprinted and had their background checked. [38] ¶ 20.

Heags received an annual training on security from the VA, which included reminders of the requirement that VA employees and contractors had to have a security clearance to work at the Hines VA. [36] ¶¶ 4–5. The contract between America's Best and the VA stated, "All Contractor personnel requiring access to the Clinic shall obtain employee identification badges and vehicle passes required by the Government. Prior to the start of this contract, the Contractor shall submit to the COR the names of all personnel employed in performing this contract and all information required to prepare identification badges for all contractor personnel." [33-1] at 175; [36] ¶ 20. Heags did not know whether the names and necessary information of the America's Best employees had been submitted to Lear. [36] ¶ 20; [33-1] at 63:7–25.

Heags testified that if Lear became aware of a security issue, he was supposed to report it to Heags, as the chief of the service. [36] ¶ 65. Heags did not have firsthand knowledge that the America's Best workers were turned away from HR but was told about it by Lopez and other America's Best workers. [36] ¶¶ 68–70. Heags did not follow up with either the Hines HR office, Lear, or Pease after he heard about the America's Best employees' difficulties getting badged. [36] ¶ 68.

### 3. *Stepdaughter Working for America's Best*

Heags found out that his stepdaughter was working at America's Best when his boss, Jon Beidelscheis, came to his office and told him that it didn't look good for her to be working at America's Best at Work. [38] ¶ 9; [36] ¶ 67. Heags told his wife, and she relayed the message to her daughter who stopped working at America's Best immediately. [38] ¶ 9. Beidelschies's recollection was in accord with Heags's and to the best of Beidelschies's knowledge, Heags's stepdaughter stopped working at America's Best. [38] ¶ 14.

## III. Analysis

### A. Sections 1981 and 1983 Claims

Judgment is appropriate as a matter of law on Heags's §§ 1981 and 1983 claims because neither claim can be brought against the federal government. *See Espinueva v. Garrett*, 895 F.2d 1164, 1165 (7th Cir. 1990) (Section 1981) *and McGuiness v. United States Postal Service*, 744 F.2d 1318, 1322 (7th Cir. 1984) (Section 1983). Defendant's motion for summary judgment is granted as to counts four and five of Heags's complaint.

### B. Disability Discrimination

Heags's complaint alleges that defendant discriminated against him on the basis of disability and invokes the Americans with Disabilities Act. [1] ¶¶ 46–54. Federal workers are not covered by the ADA, *see* 42 U.S.C. § 12111(5)(B)(i), and should use the Rehabilitation Act to bring a disability discrimination claim. *See Vargas v. DeJoy*, 980 F.3d 1184, 1188 n.4 (7th Cir. 2020).

A claim under the Rehabilitation Act requires a plaintiff to show that (1) he is a person with a disability within the meaning of the Act, (2) he is qualified to perform essential functions of his job with or without a reasonable accommodation, and (3) he suffered an adverse employment action solely by reason of his disability. *See Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022). "To succeed on a claim under the Rehabilitation Act, a plaintiff must meet the threshold burden of establishing that he is disabled within the meaning of the statute." *Stein v. Ashcroft*, 284 F.3d 721, 724 (7th Cir. 2002) (internal citation omitted). Heags has not submitted any evidence that he is a person with a disability within the meaning of the Rehabilitation Act. Because there is no basis for a reasonable jury to find proof of an essential element of Heags's claim, judgment as a matter of law is appropriate on count two of the complaint.

## C.     Race and Age Discrimination

To determine whether an employer discriminated against its employee because the employee belonged to a protected class, a court should ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Plaintiffs may organize their evidence in the *McDonnell Douglas* burden-shifting framework. *See Khungar v. Access Cmty. Healthcare Network*, 985 F.3d 565, 573 (7th Cir. 2021). Under that framework, a plaintiff makes a *prima facie* case of discrimination when he shows, "(1) he is a member of a protected class, (2) he was meeting the defendant's legitimate expectations, (3) he suffered an adverse

17

employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably." *Id.* (internal citations omitted and pronouns changed). Once a plaintiff makes a *prima facie* case, the burden shifts to the defendant to give a "legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal citations omitted). The parties chose to employ the *McDonnell Douglas* framework in their briefs.

       1.   *Adverse Action*

The threshold requirement for an employment discrimination claim is that the employee experienced an "adverse employment action." *See Ortiz*, 834 F.3d at 765. The hiring and firing of employees are the classic examples of actionable employment decisions. *See Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 743–44 (7th Cir. 2002) (tangible employment action is a "significant change in employment status, such as hiring, firing[.]"). An employee can be "constructively discharged" when either the working conditions of employment are unbearable or "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Wright v. Illinois Dep't of Children & Family Svcs.*, 798 F.3d 513, 527 (7th Cir. 2015). Heags pled that he faced an adverse employment action when he was "forced to retire" after receiving a decision that he would be terminated. [1] ¶¶ 32–35. The VA argues that because Heags submitted paperwork to retire, he was neither explicitly nor constructively discharged.

On January 22, 2021, the VA told Heags that it was going to remove him from his employment effective January 30, 2021. [36] ¶ 43. This is a constructive discharge, and the fact that Heags chose to retire so that he could maintain retirement benefits does not change the analysis. *See EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) ("When the employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge.").

The certainty of Heags's dismissal is what distinguishes this case from *Cigan v. Chippewa Falls School Dist.*, where the plaintiff retired before she was certain that her contract would not be renewed. *Id.*, 388 F.3d 331, 332–34 (7th Cir. 2004); *see also, Wright*, 798 F.3d at 529–32 (plaintiff who retired while employer's decision on termination was pending was not constructively discharged). Heags first received a "notice of removal" and, after submitting his response package, received the letter from Doelling, which stated "I have decided to remove you from VA employment under the authority of 38 U.S.C. § 714, effective January 30, 2021." [36] ¶¶ 42–43; [33-13] at 2. The VA has not presented any evidence that another step had to be taken before Heags would be terminated—"the handwriting was on the wall and the axe was about to fall." *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 502 (7th Cir. 2010) (internal citation omitted). When that is the case, "no reasonable trier of fact could find that [Heags] was not constructively discharged." *Id*. Heags suffered an adverse employment action.

2.    *Comparators*

The *McDonnell Douglas* framework requires Heags to provide evidence that the VA treated an otherwise similarly situated, younger, white employee better than he was treated. *See Khungar*, 985 F.3d at 573. A comparator must be "similarly situated with respect to performance, qualifications, and conduct. Typically, this involves showing that the employees shared the same supervisor, performance standards, and engaged in similar conduct." *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 688 (7th Cir. 2007) (internal citations omitted). When the issue is whether employees were treated differently after misconduct, "the critical question is whether they have engaged in conduct of comparable seriousness." *Peirick*, 510 F.3d at 689. Heags relies on Yenerall and Pease as the relevant comparators.[13]

The VA argues that Yenerall and Pease are not appropriate comparators because they had different supervisors than Heags. [37] at 5. The VA's only evidence that Yenerall had a different supervisor is given in its response to Heags's Local Rule 56.1 statement of additional facts. *See* [38] ¶¶ 20–23. Because the identity of Yenerall's supervisor is not "fairly responsive" to those asserted statements of fact, the additional facts are disregarded under N.D. Ill. L.R. 56.1(e)(2). Pease's supervisor was Heags. [36] ¶ 16. That establishes that Pease had a different level of responsibility from Heags so as to make Pease an unsuitable comparator. *See Senske*

---

[13] I can evaluate whether Yenerall and Pease are appropriate comparators even though Heags did not include their names in discovery responses because the VA has not argued or shown that it was prejudiced by the lack of disclosure. *See* Fed. R. Civ. P. 37(c)(1) (party cannot use undisclosed information unless failure to disclose is harmless).

v. Sybase, Inc., 588 F.3d 501, 510 (7th Cir. 2009) (Employer "entitled to hold lower-ranking employees to lower standards[.]").

The VA also argues that "Yenerall … [was] not charged with the same workplace misconduct as Heags following an AIB investigation." [37] at 5. There is undisputed evidence in the record to that effect—the AIB report found that Heags and his staff "failed to conduct the appropriate oversight of the [America's Best] contract" and that Heags failed to properly supervise contract management in EMS. [33-4] at 10, 13. The AIB concluded Yenerall notified EMS that the America's Best contractors needed to be badged, to coordinate with her staff members to do so, and that Heags failed to follow up on those directions. [33-4] at 10–11, 13. The AIB made different findings about the relative fault of Yenerall and Heags and that is a non-discriminatory basis for the difference in treatment. *See Peirick*, 510 F.3d at 689 ("[T]he critical question is whether [the two employees] have engaged in conduct of comparable seriousness."). Heags has not presented evidence that similarly situated, younger, white employees were treated better than he was; that piece of his circumstantial case for discrimination fails.

### 3. *Legitimate Expectations and Pretext*

The parties focus their argument on whether Heags was fulfilling the VA's legitimate expectations for his position. Because the proffered non-discriminatory reason for Heags's removal was that he failed to meet those expectations, determining whether Heags makes a *prima facie* case overlaps with the pretext analysis. A reviewing court can consider both at once: "because the issue of satisfactory job

performance, which lies at the heart of this dispute, must be analyzed in detail at both stages of the *McDonnell Douglas* test … we focus on pretext, while keeping in mind that if the plaintiff did not present sufficient evidence of pretext, they also did not show that they were meeting their employer's expectations." *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006); *accord Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001).

Pretext in the employment discrimination context is evidence that an employer *lied* about the reason for their action, not merely that the employer was wrong. *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012). The "task is to determine whether these were [the employer]'s true reasons for discharging [plaintiff], not whether they were wise bases for doing so." *Peirick*, 510 F.3d at 692. A plaintiff may show pretext by providing "evidence that the [proffered] reasons are without basis in fact, did not actually motivate the challenged action, or were insufficient to motivate the discharge." *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000).

First, Heags argues that some of Doelling's conclusions were exaggerations of the underlying facts, suggesting that Doelling's conclusions were not honest. Specifically, Heags's "conflict of interest" was exaggerated because other Hines employees had family members who worked at America's Best and Heags resolved the issue once he learned of it. *See* [34] at 6–7. Heags points to another senior VA official's testimony to the AIB that the situation was overblown and the stepdaughter never received a paycheck. [38] ¶ 12. But reasonable disagreement about whether the

22

situation was indeed a conflict of interest or fraud is not evidence that Doelling did not genuinely believe the situation to be improper. Furthermore, Doelling wrote in the decision on removal that Heags should have obtained ethics guidance before his stepdaughter started working for America's Best at Hines, [36] ¶ 45, not that Heags committed fraud. Heags has not provided evidence to suggest that Doelling did not genuinely believe that Heags should have obtained ethics guidance before his stepdaughter began working at America's Best.

Additionally, Heags argues that the conclusion that he "lacked candor" was exaggerated because he corrected himself during his second interview with the AIB. *See* [34] at 8–9. There is a basis in fact for Doelling's conclusion that during his first interview Heags said something that wasn't true. *See* [36] ¶¶ 29, 31. There is also evidence in the record to suggest that Heags made a genuine mistake. *See* [38] ¶ 13. That is a judgment call for Heags's supervisor to make, not proof that Doelling did not genuinely believe that Heags had told an untruth to the AIB. Pretext is an inquiry into whether the employer believes the reason it gave for the termination, not whether the reason was thoughtful or wise. *See Peirick*, 510 F.3d at 692.

Heags argues that there is evidence in the record to dispute the conclusion that he failed in his supervisory duties—first, that Yenerall and HR were responsible for contractors getting badged; second, that Heags and EMS received conflicting accounts of whether the America's Best contractors were required to be badged; and third, that the America's Best contract did not require a Contracting Officer's

23

Representative, so Lear was an appropriate point person even though his certification had lapsed. [34] at 9–13.

Heags points to testimony that HR was responsible for badging contractors, *see* [38] ¶¶ 18, 20–22, and argues an inference could be drawn that it was Yenerall's dereliction of duty that caused the workers not to be badged. [34] at 10. Heags also relies on the disputed fact of whether the EMS management team was told that no badging was necessary for the America's Best workers. [38] ¶¶ 25, 27; [34] at 10–11. Doelling's decision to hold Heags responsible for the fact that America's Best contractors were not badged was based on the fact that Heags had received an email from Yenerall telling him that the contractors needed to be badged. [36] ¶ 44; [33-13] at 2. In Doelling's opinion, Heags should have followed up to ensure the contractors were badged, even after he learned the contractors were turned away by HR. [36] ¶ 44; [33-13] at 2. Heags does not dispute that he received the email from Yenerall. *See* [38] ¶ 23; *see also* [35-1] at 232. Doelling's judgment that Heags, given his position and tenure, should have had the experience and inclination to follow up, is not undermined by the dispute over who was truly responsible. Even accepting that Yenerall and her office were responsible for the badging and that Heags received conflicting accounts of whether the contractors needed to be badged, those facts do not provide a basis to believe that Doelling was lying when he concluded that once Heags received Yenerall's email, it was Heags's responsibility (ultimately) to ensure that the America's Best workers were badged. Heags has not provided evidence on

24

which a reasonable jury could rely to find that Doelling was lying, so this dispute does not suggest pretext.

Heags's third factual challenge is to Doelling's conclusion that he allowed Lear to serve as Contracting Officer's Representative when Lear was not properly certified. [34] at 11–12. Doelling wrote in his decision that "there is substantial evidence that you failed to provide appropriate oversight of Deputy Chief Lear with respect to administering the [America's Best at Work] contract and his assignment to other contracts after his [Contracting Officer's Representative] certification had expired." [33-13] at 4. There is evidence in the record that, at the time the contract was signed, the America's Best contract did not require a Contracting Officer's Representative. *See* [38] ¶¶ 31–33. Heags submits a signed affidavit in which he avers that he "never assigned a Contracting Officer's Representative to a contract for which they were not eligible and certified to oversee." [38] ¶ 38; [35-1] at 215. But there is no evidence that Doelling had this affidavit when he made his decision, so it cannot serve as evidence that Doelling knew he was wrong when he concluded that Heags hadn't ensured Lear was properly certified for the assignments Heags gave Lear.

Finally, Heags argues that who drafted the notice of removal is a disputed material fact because if Yenerall drafted the notice of removal, an inference could be drawn that the reasons given within the notice were phony. This is akin to a "cat's paw" theory of liability where a biased employee who is not in a decision-making position is able to influence a decisionmaker. *See Brooks v. Avancez*, 39 F.4th 424, 439 (7th Cir. 2022). "To show age-based discrimination under this 'cat's paw' theory

of liability, [plaintiff] must have evidence that the biased non-supervisor actually harbored discriminatory animus against [him] and that the employee's scheme proximately caused [his] termination." *Id*. Heags has not offered any evidence that Yenerall was motivated by ageist or racist beliefs. The inference that Heags invites with his argument is that because Yenerall was ultimately responsible for the failure to badge America's Best workers she wanted to shift the blame on to Heags. But a desire to shift blame onto another, without more, is not evidence of a discriminatory animus. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 462–63 (7th Cir. 2014) (Even if plaintiff was not responsible for cited failures, he still must show that employer blamed him because of his protected status). Ultimately, even taking as true the fact that Yenerall drafted the notice, that does not provide a basis to believe that Doelling did not genuinely believe the conclusions in his letter.

At the end of the day, to survive summary judgment, the plaintiff must show that there are issues of fact in the record, which if resolved in favor of the plaintiff, could allow a reasonable jury to find that Heags was fired because of his race and age. *See Ortiz*, 834 F.3d at 765. There are some disputed facts in the record, namely whether EMS management was told that the America's Best workers did not need to be badged, whether the contract required a certified Contracting Officer's Representative, and who drafted the notice of removal. Resolving these facts in favor of Heags, they all serve as reasons why Doelling's conclusions about Heags's responsibility may have been mistaken or imprudent. But these critiques of Doelling's judgment do not provide a basis for a reasonable jury to find that Doelling's

26

conclusions were not his honest beliefs, and that's what matters in the pretext analysis. *See Coleman*, 667 F.3d at 852. And even if a jury found that Doelling's reasoning was dishonest somehow, there is no evidence in the record to suggest that Doelling's "explanations are a pretext for the prohibited animus." *Hitchock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013).

Considering all of the evidence together, Heags presents as proof of discrimination: (1) he is a member of protected classes and (2) his employer's judgment that he should be fired was mistaken. He has no evidence of comparable employees being treated better than he was, so his protected characteristics coupled with bad reasons for his termination do not allow for an inference of discrimination. *See Widmar*, 772 F.3d at 465 (where plaintiff offers nothing more than speculation that employer's justification for dismissal was a mask for discrimination, summary judgment is appropriate).

## IV. Conclusion

Defendant's motion for summary judgment, [31], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: November 13, 2023

27